UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FOX VALLEY & VICINITY CONSTRUCTION WORKERS WELFARE FUND, | ) ) ) ) ) | |
| FOX VALLEY & VICINITY CONSTRUCTION WORKERS PENSION FUND, | ) ) ) ) | |
| LAKE COUNTY, ILLINOIS, PLASTERERS & CEMENT MASONS RETIREMENT SAVINGS FUND, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | 17 C 416 |
| LOUIS MORALES, an individual, and MORALES SERVICES, LLC, an Illinois limited liability company | ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Plaintiffs Fox Valley & Vicinity Construction Workers Welfare Fund, Fox Valley & Vicinity Construction Workers Pension Fund, and Lake County, Illinois, Plasterers & Cement Masons Retirement Savings Fund's (hereinafter, the "Funds") motion for summary judgment against Defendants Louis Morales ("Morales) and Morales Services, LLC ("Morales Services") pursuant to Federal Rule

of Civil Procedure 56. For the following reasons, the Court denies in part and grants in part the Funds' motion.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted.

### A. Bravo Construction Company

Louis Morales and his wife owned Bravo Construction Company, Inc. ("Bravo") for about thirty-two years and operated the business out of their home in Huntley, Illinois. Bravo provided construction work for private subdivisions in the past but ceased doing so around 2010, after which point it mainly worked as a subcontractor for municipalities.

On June 24, 2010, Morales executed a Memorandum of Agreement ("Agreement") between Bravo and the Cement Masons and Plasterers Local Nos. 5, 11, 502 and 803 affiliated with the Northern Illinois District Council of the Operative Plasterers and Cement Masons International Association (the "Union"). The Agreement establishes and outlines the administration of the Funds, including that Bravo is obligated to report and pay fringe benefit contributions on behalf of all employees who perform bargaining unit work. The Agreement, signed by Morales, contained the following significant language:

> This Agreement is applicable to all successors, transferors, and assigns of the Employer, whether corporate or otherwise.

> The individual signing this Agreement agrees to be personally, jointly and severally liable with the Employer for any failure to pay wages or contributions, or to accurately report hours to the fringe benefit funds as required by this Agreement.

### B. Morales Services

In 2010, Morales' daughter, Melissa Morales ("Melissa"), opened her own business called Morales Services. Melissa is the sole owner of Morales Services, which performs cement finishing work for homebuilders, including former customers of Bravo, as a non-union company at non-union rates.

Melissa testified that she decided to open Morales Services independently of any conversations with her father. She graduated from high school in 2007 and worked in retail before opening her own business. She also worked for Bravo while in high school, answering calls and picking up checks for her father.

From 2010 to 2013, Morales Services was operated out of the same address as Bravo (the Morales household), while Melissa still lived with her parents. In 2013, she moved out of her parents' home and Morales Services' business address was her new home address in Hampshire, Illinois.

Melissa solicited work on behalf of Morales Services from homebuilders to perform subdivision work. Melissa also performed office work for Morales Services, including invoicing and billing, answering the phone, and payroll.

### C. Relationship Between Bravo and Morales Services

Many Bravo employees also worked for Morales Services, sometimes at the same time. Morales testified that Melissa mainly got her employees from him. Morales notes that this occurred because Bravo would run out of work and Morales Services had work for the employees. Only a couple Morales Services' employees did not also work for Bravo.

Two Bravo employees sometimes received checks from Morales Services. These employees, brothers Refugio and Jose Mejia (collectively, the "Mejias"), testified that Morales paid them from Morales Services funds when Bravo had insufficient funds to pay them. These employees performed cement finishing work regardless of whether they were paid by Morales Services or Bravo.

The Mejias testified that they thought they worked for Morales personally and were not aware that they were performing work for Morales Services when they received paychecks from Morales Services. Morales, on the other hand, explains that he had a meeting with Bravo employees during which he informed them that Bravo did not have work, but Morales Services did. The Bravo employees were told that they could work for Morales Services if they wished, but that Morales Services would not pay benefit contributions because it was a non-union company. The Mejias were not present during this meeting.

Morales supervised all jobs for Bravo and occasionally supervised jobs for Morales Services. Felix Morales, Morales' son who worked for both Bravo and

Morales Services, testified that he reported to his father for both jobs. The Mejias similarly reported to Morales at all times. Morales sometimes helped Melissa bid jobs for Morales Services.

Melissa did not know all of Morales Services' employees' names. For some, she only knew their nicknames, not their legal names. Jose Mejia testified that he never met Melissa, while Refugio Mejia testified that he met Melissa at Morales' house party. Refugio did not know that Melissa ran a construction company.

Morales, his wife, and his sons Felix and Louis have all assisted with Morales Services. Morales helped Melissa with various aspects of Morales Services' business, including bidding, getting contacts and employees, supervising jobs, renting equipment, and paperwork. Morales was not compensated for his assistance.

Both Bravo and Morales Services utilized the same accountant, Trish Walters ("Walters"). Walters provided payroll and bookkeeping services for Bravo and helped prepare payroll for Morales Services. Bravo and Morales Services also used the same bank and insurance broker, though each had its own banking accounts and insurance. Morales Services maintains a separate phone number from Bravo, has a separate tax identification number, and manages its own payroll.

Bravo was a union company, while Morales Services is not. Bravo's state work typically required a signatory employer, while Morales Services performed work for home builders that did not require a signatory employer. Morales paid Bravo employees union rates. Melissa never wanted to be a union company because it was

double the payroll to pay employees fringe benefits and because Melissa did not want to deal with the union's "harassment." Melissa and Morales are "pissed off" for what the union did to Morales.

### D. Audit of Bravo and Bankruptcy

To ensure the accuracy of Bravo's contributions to the Funds, an audit was performed on Bravo's payroll books and records for the period of October 1, 2012 through October 19, 2016. The audit report found that Bravo failed to submit fringe benefits contributions in the amount of $176,495.35. A 10% liquidated damages surcharge was assessed against Bravo in the amount of $17,649.54. The auditing fees, which Bravo is liable to pay, amount to $1,226.25.

Defendants deny that contributions were required for all individuals listed in the audit report. They concede that three individuals listed on the audit report performed bargaining unit work, but claim that the remaining three individuals, namely Jose Mejia, Refugio Mejia, and Felix Morales, performed work for Morales Services and accordingly did not require contributions. Defendants provide no evidence nor do they cite to anything in support of these statements.

On October 19, 2016, Bravo filed for Chapter 7 bankruptcy. The bankruptcy is still pending. Bravo never terminated the Memorandum of Agreement with the Union. Morales continued to work with Morales Services after Bravo filed bankruptcy.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Id.* at 255.

## DISCUSSION

The Funds seek summary judgment against Defendants for all delinquent contributions, liquidated damages, and audit fees based on the audit of Bravo's payroll records in the amount of $195,371.14. It is undisputed that Bravo incurred a debt to the Funds for failing to pay its contributions as required under Section 515 of the Employment Retirement Income Security Act of 1974 ("ERISA"). Because Bravo has filed for bankruptcy, the Funds request that the Court finds Morales personally liable and that Morales Services is also liable as either the alter ego or successor of Bravo.

### I. Alter Ego Liability

"[O]ne corporation is the alter ego of another where the factors necessary to support a 'single employer' finding are met *and*, in addition, the second corporation is found to be merely a 'disguised continuance' of the employing enterprising, resulting in evasion of the employer's obligations under the labor laws." *Cent. Ill. Carpenters*

*Health & Welfare Trust Fund v. Struben*, 2009 WL 497393, at *20 (N.D. Ill. 2009). Unlawful motive or intent is the most critical factor in the alter ego analysis.

The single employer analysis focuses on four factors: (1) common ownership; (2) common management; (3) interrelation of operations; and (4) centralized control of labor relations. *Lippert Tile Co. v. Int'l Union of Bricklayers and Allied Craftsmen, Dist. Council of Wis.*, 724 F.3d 939, 946 (7th Cir. 2013). No single factor is dispositive, and courts must "weigh the totality of the circumstances." *Id.* at 946–47.

### A. Common Ownership

Common ownership typically applies when two companies are owned by the same individual(s). Morales and his wife owned Bravo; Melissa is the sole owner of Morales Services. There is no formal common ownership of the two companies. The Funds note that ownership of two companies by members of the same family is evidence of common ownership, but the case they cite to itself states that this "fact alone is not enough." *Central Ill. Carpenters Health and Welfare Fund v. Struben*, 2009 WL 497393, at *21 (C.D. Ill. 2009). The fact that Morales Services was once operated out of the Morales household and Morales family members worked for both companies does not speak to common ownership. Bravo and Morales Services were thus not commonly owned.

### B. Common Management

The question of common management is trickier. The Funds argue that Morales managed both Bravo and Morales Services. They point to the fact that Morales helped

Melissa in many aspects of the business, including the bidding process and supervising jobs. They also highlight Melissa's inexperience in the construction and/or cement finishing field, having worked in retail jobs and graduated high school just three years before opening Morales Services. While these facts certainly tend to question Melissa's competency to fully operate and manage Morales Services, the record is equivocal as to Morales' involvement in the business. The evidence demonstrates that Morales *occasionally* helped Melissa with bidding and supervising jobs. Melissa testified that she was in charge of hiring employees, soliciting homebuilders for work, and billing and invoicing the customers. On the other hand, the Mejias and Morales' son testified that they reported to Morales for both Bravo and Morales Services jobs.

Neither side's version of the facts trumps the other. Looking at the facts in the light most favorable to Defendants, a reasonable jury could plausibly find in their favor. Morales' involvement in both businesses does not, alone, destroy the separateness of management evinced in the record. *See Trustees of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 788 (7th Cir. 1993) (finding the fact that one individual managed the work sites for both business "not sufficient to destroy the separateness of management"). The common management inquiry focuses on the degree of actual or active control over operations. *Chicago Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1357 (N.D. Ill. 2016). At the very least, there is a genuine issue of material fact as to whether

Morales truly managed both Bravo and Morales Services, which cannot be determined at this juncture.

## C. Interrelation of Operations

The Funds contend that Bravo and Morales Services were "completely interrelated" because they both operated out of the same house for a few years, used the same bookkeeper, bank, insurance company, and had many of the same employees. Defendants note that, though the two businesses used the same bank and insurance broker, they always maintained separate accounts.

The Funds also highlight that Bravo and Morales Services were a union and a non-union company performing the same type of work in the same region but for different customer segments (union and non-union). This type of relationship is also known as "double-breasting." *See Lippert*, 724 F.3d 942, 948. Furthermore, whether employees worked for Bravo or Morales Services depended on which company had work at the time. On this point, Defendants insist that Bravo employees were offered the opportunity to work at Morales Services and were told that it was a non-union company. Morales did not direct any Bravo employees to work for Morales Services.

When analyzing the interrelation of operations, "it is the 'day-to-day operational matters' that are most relevant." *Lippert*, 724 F.3d at 947. Using the same bank, insurance broker, and accountant indicates an interrelation of operations. *See id.*; *TMG Corp.*, 206 F. Supp. 3d at 1357. Operating out of the same space, at least for the first three years of Morales Services' business, also demonstrates that the operations of the

two business were interrelated. Bravo and Morales Services went so far as to share employees and shift them from one company to another depending on which one had work. On these facts, no reasonable fact finder could find that the two companies conducted their day-to-day operations separately.

### D. Centralized Control of Labor Relations

Lastly, the Funds argue that Morales was the central figure in labor relations for both Bravo and Morales Services. For centralized control of labor relations, the courts consider whether the same person or entity was responsible for making day-to-day labor decisions like setting wages, hiring, and firing. *Lippert*, 724 F.3d at 947. The Funds claim that Morales hired the employees for both companies and note that Morales Services employees believed they were working for Morales and not Melissa.

The evidence before the court does not unequivocally support the Funds' contention that Morales was the central figure for both companies' labor relations. First, while the Funds claim that Morales hired employees for both companies, both Morales and Melissa testified that Melissa did the hiring for Morales Services. While Morales may have influenced his employees to also work for Morales Services, he neither directed nor hired them for Morales Services according to the record.

Moreover, there seems to be a factual dispute as to how Bravo employees were informed of Morales Services work. The Funds frame it as Morales ultimately "hiring and communicating with the employees about pay and assignments of work" between both Bravo and Morales Services, depending on which company had work. This led to

some employees not being aware that they were performing work for Morales Services, even though they received paychecks from Morales Services. Defendants, on the other hand, state that Morales made clear to his Bravo employees that the work discussed would be for Morales Services, a non-union company, and that they accordingly would not receive benefits. Nonetheless, there must have been some confusion, as the Mejias testified that they were unaware that they were working for Morales Services and believed that they were receiving checks from Morales Services simply because Bravo did not have sufficient funds.

The Funds assert that the evidence supports the reasonable conclusion that labor relations for both companies were controlled by Morales. But the actual standard is whether a fact finder may reasonably find in favor of Defendants, and we find that the evidence allows for such a conclusion just as well. There is a genuine dispute of material fact, *i.e.*, Morales' role in informing Bravo employees of Morales Services' work and how he framed the discussed work, that forestalls the Court from determining whether there was a centralized control of labor relations.

\*   \*   \*

It is difficult to crystallize a record peppered with imperfections such as those before the Court. To rule on a summary judgment motion, however, the Court must have a clear and unequivocal record supporting the desired conclusion and leaving no reasonable doubt that the opposite conclusion can similarly be reached. Here, we are faced with a situation where a reasonable fact finder could quite possibly find for either

side. More troubling for the Court are the numerous contradictions in testimony that necessitate credibility assessments to determine whose testimony is to be believed, an activity that the Court cannot exercise on a summary judgment motion. For these reasons, the Court cannot determine whether Bravo and Morales Services are a single employer on the facts before it and therefore denies the Funds' motion for summary judgment.

While "meeting all of the elements of the single employer doctrine is not essential to a finding that the alter ego doctrine applies," *Favia*, 995 F.2d at 789, the Court finds the situation before it distinguishable from those cases where just one element is missing. Without making a determination on whether Bravo and Morales Services are a single employer, the Court need not delve into the alter ego analysis.

## II. Successor Liability

The Funds also argue that Morales Services is liable for Bravo's obligations as its successor. A predecessor's liability may be imposed on a successor when: (1) there is sufficient continuity between the two companies and (2) the successor company had notice of the predecessor's liability. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990). The Funds argue that both these factors are present and Morales Services is therefore a successor of Bravo. The Funds confuse the standard for determining successor *liability* as the standard for determining successorship, however, and provide no evidence to confirm that Morales Services is, in fact, Bravo's successor.

13

A successor company is one that takes on the assets and liabilities of a former company, typically through a merger or acquisition. Or, a company may wind up its business and form a new company to continue the former company's affairs. No such process has occurred between Bravo and Morales Services. While the mere fact that Bravo and Morales Services co-existed does not preclude a finding of successorship, there is no evidence that Morales Services is Bravo's successor. There was no meaningful transfer of assets from Bravo to Morales Services such that Morales Services was continuing Bravo's work once it had pursued bankruptcy. That Morales Services performs similar work as Bravo does not deem Morales Services its successor. The Funds failed to provide sufficient evidence to establish that Morales Services is Bravo's successor. Morales Services is therefore not responsible for Bravo's liabilities.

### III. Morales' Individual Liability

Defendants spend their briefs arguing that Morales Services is not liable for Bravo's liabilities but offer no real response to the Funds' argument that Morales is personally liable. As discussed in the Background section of this opinion, Morales executed an Agreement with the Union under which he agreed to be "personally, jointly and severally liable" with Bravo for failure to pay wages or contributions. We therefore find Morales personally liable for Bravo's failed contributions.

We note, however, that Defendants dispute the final amounts due under the audit because they contend that three employees listed were actually performing work for Morales Services. Given the inconsistencies on the record regarding the single

14

employer issue and whether certain individuals were truly working for Bravo or Morales Services, the Court cannot determine whether Morales is liable for the total amounts due.

## CONCLUSION

For the aforementioned reasons, the Funds' motion for summary judgment is granted in part and denied in part. It is so ordered.

Dated: 1/17/2019

*Charles P. Kocoras*
Charles P. Kocoras
United States District Judge